**United States District Court**
**Southern District of Texas**
**FILED**

**MAY 2 2 2012**

**David J. Bradley, Clerk of Court**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | CRIMINAL NO.  B-12-435 |
| | § | |
| FERNANDO ALEJANDRO CANO-MARTINEZ | | |

### INDICTMENT

**THE GRAND JURY CHARGES:**

**At all times material to this Indictment:**

### COUNT ONE
[Conspiracy To Commit Money Laundering
Title 18, United States Code, 1956(h)]

#### A. Introduction

1.     Beginning no later than January 1, 1998, and continuing to the present, there existed a large-scale criminal organization known as the "Gulf Cartel." The armed branch or 'muscle' of the Gulf Cartel was known as the "Zetas," or "Los Zetas," comprised in part of military deserters from the armed forces of Mexico. The headquarters of the Gulf Cartel was in Matamoros, Tamaulipas, Mexico, across the international border from the city of Brownsville, Texas.

2.     The Gulf Cartel conducted numerous criminal activities, including, but not limited to: (a) the acquisition, possession, and distribution of large quantities of controlled substances, including marihuana and cocaine; (b) smuggling controlled substances to the United States; (c) extortions; (d) kidnappings; and (e) murders.

3.     The primary destination market for controlled substances acquired by the Gulf Cartel was the United States. Cocaine and marihuana were distributed in the Southern and Western Districts of Texas and elsewhere in the United States. Proceeds from the distribution of cocaine and

marihuana consisted of large amounts of United States currency, which were transported in the reverse direction, that is, from the United States to the State of Tamaulipas in Mexico.

4.    To ensure the continuation of their illegal enterprises, members and associates of the Gulf Cartel used portions of the proceeds derived from the activities articulated in paragraphs two (2) and three (3), above, to pay large bribes to high-level elected officials in the State of Tamaulipas and candidates for such offices on an ongoing basis.  These bribes were paid in exchange for little or no police interference or forebearance of police action concerning the Gulf Cartel's narcotics trafficking and money laundering activities within the State of Tamaulipas.

5.    The bribes were paid directly to corrupt high-level elected officials and candidates for office, and their respective allies, police authorities, and persons within the justice sector of the State of Tamaulipas.  This practice occurred at least beginning 1998 through the present, and the aggregate sum of all bribes so paid is unknown, but it is estimated to be well into the millions of dollars.

## B. The Conspiracy

6.    From on or about January 1, 1998, and continuing thereafter up to the date of this indictment, in the Southern District of Texas and elsewhere, and within the jurisdiction of this Court, the Defendant,

## FERNANDO ALEJANDRO CANO MARTINEZ,

did knowingly combine, conspire, and agree with other persons known and unknown to the Grand Jury to commit an offense defined in Title 18, United States Code, Section 1956(a)(2)(B)(i), to-wit: to transport, transmit, and transfer, and attempt to transport, transmit, and transfer monetary instruments and funds involving the proceeds of specified unlawful activity as defined by Title 18,

2

United States Code, Section 1956(c)(7)(B), to include narcotics trafficking, bribery, and theft, to a place in the United States from or through a place outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, as that term is defined in Title 18, United States Code, Section 1956(c)(7)(B), to include narcotics trafficking, bribery, and theft.

### C. The Manner and Means of the Conspiracy

7.     It was a part of the conspiracy that **FERNANDO ALEJANDRO CANO MARTINEZ (CANO)** would and did frequently and routinely receive and control large bribe payments destined for the benefit of holders of and candidates for high-level elected offices and positions within the State of Tamaulipas. These bribes were transmitted by members and associates of the Gulf Cartel, but also by others for purposes unrelated to Cartel business.

8.     It was further a part of the conspiracy that **CANO**, among other things, would and did frequently and routinely direct or oversee the transfer of proceeds and 'earnings' from said proceeds from Mexico to the United States, and these transfers were conducted in a manner designed to conceal the ownership, nature, source, and control of such proceeds.

9.      It was further a part of the conspiracy that when such proceeds reached the United States, **CANO** would and did use such proceeds to purchase assets in the United States, and these purchases were made using third-party or nominee names. Said proceeds were also used to fund ongoing costs associated with some of said assets.

10.     It was further a part of the conspiracy that **CANO**, together with one or more

3

unindicted co-conspirators, would and did form a series of business entities under the laws of the State of Texas, which entities included limited liability companies ("LLCs") and limited partnerships ("L.P.s").

11.     It was further a part of the conspiracy that **CANO**, together with one or more unindicted co-conspirators, would and did establish and use these LLCs and L.P.s as business 'fronts.'  By utilizing these LLC's and L.P.s as business fronts, **CANO**, together with one or more unindicted co-conspirators, did fraudulently obtain loans and credit from federally insured banking institutions inside the United States.

12.     It was further a part of the conspiracy that **CANO**, together with one or more unindicted co-conspirators, would and did use the business 'fronts' as means by which to hide the true ownership, nature, source, and control of the proceeds of the aforementioned illegal activities.

### D. Overt Acts

13.     To accomplish the objects of the conspiracy, the following overt acts, among others, were committed in the Southern District of Texas and elsewhere:

(a)     In or about May of 2005, **CANO**, together with one or more unindicted co-conspirators, caused the formation of "SPI Ling & Marlin Townhome Project, L.P." (SPI Ling L.P.), and "SPI Development Partners, LLC" (SPI Development LLC).  SPI Development LLC was the general partner of SPI Ling L.P.

(b)     In or about June of 2005, **CANO**, together with one or more unindicted co-conspirators, caused SPI Ling L.P. to apply for and receive a loan from Inter National Bank in McAllen, Texas, in the amount $610,000.  The stated purpose of the loan was the acquisition and development of real estate, and the named developer was SPI Ling L.P.

4

(c)     In or about March of 2007, **CANO**, together with one or more unindicted co-conspirators, caused SPI Ling L.P. to apply for and receive a loan from Lone Star National Bank in Pharr, Texas, in the amount of $3,050,000.  The stated purpose of the loan was the acquisition and development of real estate, and the named developer was SPI Ling L.P.

(d)     In June of 2005, **CANO** personally guaranteed the $610,000 loan.  In March of 2007 **CANO** personally guaranteed the $3,050,000 loan.

(e)     In or about March of 2005, **CANO**, together with one or more unindicted co-conspirators, caused the formation of "Premier International Holdings, Ltd." (Premier), a limited partnership.  The general partner of Premier was "AGM Investments, LLC," which was formed by an unindicted co-conspirator in February, 2005.

(f)     In or about December of 2005, **CANO**, together with one or more unindicted co-conspirators, caused Premier to apply for and receive a loan from Inter National Bank in McAllen, Texas, in the amount of $2,570,000.  The stated purpose of the loan was the purchase of a 2005 "Pilatus" aircraft, which was registered with the Federal Aviation Administration (FAA) under registration number N679PE, commonly referred to as a "tail number."

(g)     In or about December of 2005, **CANO** signed as a guarantor of the $2,570,000 loan.

(h)     In or about December of 2005, **CANO**, together with one or more unindicted co-conspirators, caused the formation of "Cantera-Parkway Development Partners of  SA, L.P." (Cantera L.P.) and "SA Cantera Development Partners, LLC" (Cantera LLC).  Cantera LLC became the general partner of Cantera L.P.

(i)     In or about February of 2006, **CANO**, together with one or more unindicted co-conspirators, caused Cantera L.P. to apply for and receive a loan from First National Bank,

5

Brownsville, Texas, for approximately $6,665,000, which was used for the purchase of approximately forty-six (46) acres of land in Bexar County, Texas, and within the Western District of Texas.

(j)      In or about February of 2006, **CANO** signed as a guarantor of the $6,665,000 loan.

(k)      In or about June of 2006, **CANO**, together with one or more unindicted co-conspirators, caused the formation of "Culebra 179 Acre Residential Development, L.P." (Culebra 179 L.P.).

(l)      In or about July of 2006, **CANO**, together with one or more unindicted co-conspirators, caused the formation of "Culebra SA 179 Management LLC" (Culebra 179 LLC), which became the general partner of Culebra 179 L.P.

(m)      In or about July, 2006, **CANO**, together with one or more unindicted co-conspirators, caused Culebra 179 L.P. to apply for and receive a loan in the amount of $3,626,000 from Falcon International Bank, Laredo, Texas, which was used toward the purchase of approximately one-hundred-seventy-nine (179) acres of land on Culebra Road in Bexar County and within the Western District of Texas. Culebra 179 L.P. completed the purchase of this land in July of 2006. **CANO** signed as a guarantor of the $3,626,000 loan in July of 2006.

(n)      In August of 2006, **CANO**, together with one or more unindicted co-conspirators, caused the formation of "Culebra SA 104 Acre Residential Partnership, L.P." (Culebra 104 L.P.) and "Culebra SA 104 Management LLC" (Culebra 104 LLC). Culebra 104 LLC became the general partner of Culebra 104 L.P.

(o)      In or about August, 2006, **CANO**, together with one or more unindicted co-conspirators, caused Culebra 104 L.P. to apply for and receive a $2,874,000 loan from Falcon

International Bank, which was used toward the purchase of approximately one-hundred-four (104) acres of land on Culebra Road in Bexar County and within the Western District of Texas. Culebra 104 L.P. completed the purchase of this land in August of 2006. **CANO** signed as a guarantor of the $2,874,000 loan, in August, 2006.

(p)     During the course of the conspiracy, **CANO**, and/or one or more unindicted co-conspirators, established and helped to establish approximately ten (10) bank accounts in Mexico, to include accounts at HSBC, Scotia Bank, BBVA Bancomer, Banamex, and Banregio.

(q)     Beginning in or about 2007, and continuing thereafter to in or about 2009, **CANO** and/or one or more unindicted co-conspirators, or all of them together, caused large amounts of pesos, aggregating in the tens of millions, to be deposited to the Mexican bank accounts collectively and later transferred to a Mexico-based money transmitter business known as "Monex."

(r)     Beginning in or about 2007, and continuing thereafter to in or about 2009, **CANO**, and/or one or more unindicted co-conspirators, caused the funds to be transferred yet again, from Monex to accounts held in financial institutions within the United States, oftentimes the same day the funds arrived at Monex. These United States accounts included Account No. XXX539, a Premier account held at Inter National Bank, McAllen, Texas, and Account No. XXX879, a Cantera Parkway account held at First National Bank, Brownsville, Texas.

(s)     Specifically, from in or about June of 2008 through in or about March of 2009, **CANO**, and/or one or more unindicted co-conspirators, caused the following transfers to be made from Monex to the Premier account:

| Approximate Date | Approximate Amount |
|---|---|
| June 2008 | $99,272 |

| | |
|---|---|
| September 2008 | $99,850 |
| December 2008 | $147,492 |
| March 2009 | $100,000 |
| June 2009 | $50,000 |

(t)     Specifically, from in or about June of 2008 through December of 2009, **CANO**, and/or one or more unindicted co-conspirators, caused the following transfers to be made from Monex to the Cantera Parkway account at First National Bank:

| Approximate Date | Approximate Amount |
|---|---|
| June 2008 | $315,000 |
| July 2008 | $100,000 |
| August 2008 | $100,000 |
| September 2008 | $312,500 |
| October 2008 | $100,000 |
| November 2008 | $100,000 |
| December 2008 | $240,000 |
| February 2009 | $50,000 |
| April 2009 | $270,000 |
| May 2009 | $45,000 |
| July 2009 | $210,700 |
| September 2009 | $210,000 |
| December 2009 | $210,000 |

(u)     During the relevant time period covered by the conspiracy, other persons and entities transferred additional funds to Cantera Parkway Account No. XXXX879, held at First National Bank.  The aggregate sum of these additional transfers exceeded $1,500,000.  Some of these

additional transfers were from Mexican companies, including, but not limited to, "GMC S.A. de C.V." and "Expide Technologia, S.A. de C.V."

(v)      Account No. XXXX734, yet another account styled under a variation of the "Cantera Parkway" name, was established at First National Bank in April of 2010.  From in or about April of 2010 through April of 2012, the approximate aggregate sum of all transfers and deposits to this account exceeded $3,000,000.

(w)      In or about May of 2008, an unindicted co-conspirator established Account No. XXXX749, styled under the name "SPI Ling & Marlin Townhome Development," at Lone Star National Bank in Pharr, Texas.  In May of 2008 an unindicted co-conspirator requested a wire transfer of $100,000 from Monex in Mexico to this account in the United States.

(x)      In addition to transfers from Monex in Mexico to United States accounts styled in the names of entities in which **CANO** held concealed interests, there were other transfers to the United States accounts aggregating in the hundreds of thousands of dollars.

[All in violation of Title 18, United States Code, Section 1956(h)].

## COUNT TWO
### [Conspiracy - False Statements To Financial Institution and Bank Fraud Title 18, United States Code, Section 371]

### A. Introduction

14.      The Grand Jury hereby realleges and incorporates each and every allegation in Section A of Count One (1) of this Indictment.

### B. The Conspiracy

15.      From on or about January 1, 2005, and continuing thereafter up to the date of this indictment, in the Southern District of Texas and elsewhere, and within the jurisdiction of this Court,

the Defendant,

### FERNANDO ALEJANDRO CANO MARTINEZ,

did knowingly combine, conspire, and agree with other persons known and unknown to the Grand

Jury to commit offenses defined in Title 18, United States Code, Sections 1014 and 1344, to-wit: to

knowingly make false statements to depository institutions, the deposits of which were insured by

the Federal Deposit Insurance Corporation, for the purpose of influencing the actions of said

institutions, and to obtain moneys, funds, credits, and assets owned and under the custody of

financial institutions, the deposits of which were insured by the Federal Deposit Insurance

Corporation, by mean of false and fraudulent pretenses, representations and promises.

## C. The Manner and Means of the Conspiracy

16.     The Grand Jury hereby realleges and incorporates each and every allegation in Section

C of Count One (1) of this Indictment.

## D. Overt Acts

17.     To accomplish the objects of the conspiracy, the following overt acts, among others,

were committed in the Southern District of Texas and elsewhere:

(a)     In or about February of 2005, an unindicted co-conspirator formed "AGM

Investments, LLC.," with its registered agent's address in Brownsville, Texas.

(b)     In or about May of 2005, an unindicted co-conspirator formed "SPI Development

Partners, LLC," with its registered agent's address in Brownsville, Texas. "AGM Investments, LLC"

became a manager, registered agent, and charter officer of "SPI Development Partners, LLC."

(c)     In or about May of 2005, an unindicted co-conspirator formed "SPI Ling & Marlin

Townhome Project, L.P.," with  its registered agent's address  in Brownsville, Texas.  "SPI

Development Partners, LLC" became the general partner of "SPI Ling & Marlin Townhome Project, L.P."

(d)     In or about March, 2007, **CANO**, together with one or more unindicted co-conspirators, caused "SPI Ling & Marlin Townhome Project, L.P." to apply for and receive a loan in the approximate amount of $3,050,000 from Lone Star National Bank in Hidalgo County, Texas, the deposits of which were insured by the Federal Deposit Insurance Corporation. Lone Star National Bank approved the application and funded the loan. The loan closing occurred at a law office in Hidalgo County, Texas.

(e)     In support of and in connection with the application for the $3,050,000 loan from Lone Star National Bank, **CANO** made material, false, and misleading representations to Lone Star National Bank representatives, including, but not limited to, representations that he had no significant liabilities and a net worth of approximately $20,000,000.

(f)     Further, in connection with the application for the $3,050,000 loan from Lone Star National Bank , **CANO** made material omissions, which included that he failed to disclose in the financial documents he presented to Lone Star National Bank that he had incurred with other United States financial institutions during the approximate time period of 2005 - 2006 liabilities in excess of approximately $15,000,000, and that one of his principal sources of funds or 'income' was illegal money derived from narcotics trafficking, money laundering, and bribery activities. He further failed to advise that he was acting as a nominee for another unindicted co-conspirator.

[All in violation of Title 18, United States Code, Section 371].

## NOTICE OF FORFEITURE

11

18.     Pursuant to Title 18, United States Code, Sections 982(a)(1), 981(a)(1)(A), 981(a)(1)(C) and Title 28, United States Code, Section 2461, upon conviction of the offense charged in Count One, the Defendant **CANO** shall forfeit to the United States of America any property, real or personal, involved in a transaction or attempted transaction in violation of the offense charged in Count One or any property traceable to such property.  Additionally, the Defendant **CANO** shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of the offense charged in Count One.  The property to be forfeited includes, but is not limited to, the following:

      a.     Money judgment payable to the United States of America in the approximate amount of  $ 20,000,000.00

19.     Pursuant to Title 18, United States Code, Sections 982(a)(2), upon conviction of the offense charged in Count Two, the Defendant **CANO** shall forfeit to the United States of America any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the violation of the offense charged in Count Two.  The property to be forfeited includes, but is not limited to, the following:

      a.     Money judgment payable to the United States of America in the approximate amount of $ 20,000,000.00

Substitute Property

If any of the property described above, as a result of any act or omission of the Defendant

**CANO**:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without
           difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b) and Title 28, United States Code, Section 2461.

A TRUE BILL

_____

FOREPERSON OF THE GRAND JURY

13

KENNETH MAGIDSON
United States Attorney

By: _____
Charles Lewis
Assistant United States Attorney

_____
Julie Hampton
Assistant United States Attorney

_____
Jody Young
Assistant United States Attorney